# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| RICHARD H. RUEBE, JEFFREY W. LEMAJEUR, VINCENT J. KWASNIEWSKI, and NEAL T. JAKEL, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 18-cv-01192 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| PARTNERRE IRELAND INSURANCE DAC, ANV CORPORATE NAME LIMITED THE UNDERWRITING MEMBER OF ANV SYNDICATE 1861 AT LLOYD'S FOR THE 2014 YEAR OF ACCOUNT, AXIS SPECIALTY EUROPE SE, and NAVIGATORS UNDERWRITING AGENCY LIMITED FOR AND ON BEHALF OF THE UNDERWRITING MEMBERS OF SYNDICATE 1221 AT LLOYD'S FOR THE 2014 YEAR OF ACCOUNT, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION AND ORDER

This insurance case involves a dispute about coverage for a lawsuit in state court.

Plaintiffs Ruebe, Lemajeur, Kwasniewski, and Jakel served on the board of an ethanol company, and voted in favor of a forced buyout of the minority owners. Almost two years later, the parent of the ethanol company applied for insurance, and represented that it was not aware of any circumstances that might give rise to claims. And a few months later, the minority owners sued the board members in state court about the buyout. The four board members, in turn, filed this federal suit against the excess carriers to obtain a declaratory judgment that they are entitled to coverage.

There are two layers of excess policies (the "Second Layer" and the "Third Layer") on top of the primary policy. The excess carriers challenged the complaint by filing a pair of motions. The Second Layer insurers (meaning the first layer of excess carriers) moved for judgment on the pleadings. They argue that Plaintiffs pled themselves out of court because the complaint itself shows that they were aware of potential claims. They also attempt to drag material from the state court case before this Court. They rely on material outside the pleadings to support a motion for judgment on the pleadings.

The Third Layer insurers, for their part, moved to dismiss. They argue that they have no obligation to provide coverage because Plaintiffs have not yet exhausted the primary policy (let alone the other excess policy). So the claims for coverage are not yet ripe.

For the reasons explained below, the motion for judgment on the pleadings by the Second Layer insurers is denied. The motion to dismiss by the Third Layer insurers is granted.

## Background

### A.    The Minority Buyout

This insurance coverage litigation springs from the buyout of minority unitholders in a company – Illinois River Energy Holdings, LLC ("IREH") – that ran an ethanol plant in Rochelle, Illinois. *See* Second Am. Cplt. ¶¶ 4–7, 26–27 (Dckt. No. 62). The company had a seven-person board of managers. *Id.* at ¶ 26. The majority unitholder controlled four of the seven seats, and appointed Plaintiffs Ruebe, Lemajeur, Kwasniewski, and Jakel to serve on the board. *Id.* The minority unitholders controlled the other three seats. *Id.*

In 2012, the IREH board approved a buyout of the minority unitholders and a merger of IREH into a subsidiary of the majority unitholder (the "Minority Buyout"). *Id.* at ¶ 27. The board approved the buyout with the guidance of outside counsel, and at the price calculated by an independent valuation firm. *Id.* at ¶ 29. The deal ultimately went through. Each of the

2

minority owners tendered their units and accepted payment for their stake in the company. *Id.* at ¶ 48(c).

According to the complaint, Sinav Limited – the parent company of IREH – and its subsidiaries had "no reason to 'believe' that minority unitholders would bring a claim related to the Minority Buyout." *Id.* at ¶ 48 (quoting the insurance policy). Some minority unitholders did express dissatisfaction with the deal in the first quarter of 2012. *Id.* at ¶ 48(e). But by January 2014, they gave "no indication that they would pursue legal action related to the Minority Buyout." *Id.* In fact, "multiple minority unitholders" told Plaintiffs Lemajeur and Ruebe in the wake of the buyout that they had no plans to sue. *Id.* at ¶ 48(f).

## B. The Insurance Policies

Nearly two years passed, and no one sued over the Minority Buyout. *Id.* at ¶ 48(b). That's when Sinav Limited – again, the parent company of IREH – applied for insurance coverage.

In January 2014, Sinav applied for insurance for itself and its subsidiaries, including IREH. *Id.* at ¶ 18. Sinav completed an application called the "Proposal Form" that asked questions about the business, history, and structure of the company. *Id.* at ¶ 44; *see also* Proposal Form, at 1–4 (Dckt. No. 62-1, at 2–5 of 71). The Proposal Form requested documents such as auditor reports and prospectuses, and asked about current levels of insurance, too. *See* Proposal Form, at 1–3 (Dckt. No. 62-1, at 2–4 of 71).

Importantly, the Proposal Form also asked questions about any actual and pending claims in a section titled "**CLAIMS INFORMATION/CIRCUMSTANCES**." *See id.* at § 6 (Dckt. No. 62-1, at 4 of 71). The first question asked if there were any "now pending" claims, and Sinav answered "No." *Id.* The second question asked about "any circumstance" that "may give rise" to a claim: "Is the Proposer aware, after enquiry, of any circumstance or incident, which

3

may give rise to a claim against any Director or Officer of the Company in such capacity?" *Id.* Once again, Sinav's answer was simple and unequivocal: "No." *Id.*

Sinav did not mention the Minority Buyout in the Proposal Form. And Sinav did not reveal that some minority unitholders had expressed dissatisfaction with the deal, albeit two years earlier.

Candor mattered. The Proposal Form expressly requested "full and complete answers." *Id.* at 1 (Dckt. No. 62-1, at 2 of 71). The Form highlighted the "duty" to provide all information requested, "as well as to add additional relevant facts." *Id.* A "relevant fact" was something that may – *may* – impact the assessment of risk by a potential insurer. "A relevant fact is such known fact and/or circumstance that may influence the evaluation of the risk by the insurer." *Id.* If in doubt, the Form encouraged the applicant to speak up and raise questions: "If you have any doubts about what a relevant fact is, please do not hesitate to contact your broker." *Id.*

Plaintiff Lemajeur signed the application on behalf of Sinav in his capacity as the CFO. *Id.* at 4 (Dckt. No. 62-1, at 5 of 71). A declaration of truthfulness appeared right above his signature. "We declare that the statement and particulars in this Proposal form are true and that no material facts have been misstated or suppressed after enquiry." *Id.* Sinav also agreed to update the application if something changed before issuance of a policy. *Id.* "We agree that should any of the information given by us alter between the date of this Proposal and the inception date of the insurance to which this proposal relates, we will give immediate notice thereof." *Id.* Finally, Sinav expressly "agree[d] that this Proposal, together with any other information supplied by [Sinav] shall form the basis of any contract of insurance effected thereon." *Id.*

The Proposal Form was just that – a proposal submitted by Sinav to buy insurance. It was not a binding agreement to buy or sell insurance, but it did become part of the eventual policy. *See id.* at 1 (Dckt. No. 62-1, at 2 of 71) ("This proposal form does **NOT BIND** the Proposer to complete the insurance but will form part of any insurance[.]") (bold and all caps in original); *id.* at 3 (Dckt. No. 62-1, at 4 of 71) ("**SIGNING THIS PROPOSAL FORM DOES NOT BIND THE PROPOSER OR THE INSURER TO COMPLETE THIS INSURANCE**") (bold and all caps in original).

On February 16, 2014, Sinav ultimately purchased insurance for all of its subsidiaries, including IREH. *See* Second Am. Cplt. ¶ 19. Sinav bought three distinct layers of directors' and officers' insurance, each provided by different insurers. *Id.* at ¶¶ 20–22. Each insurance policy expressly lists Sinav's Proposal Form dated January 8, 2014, as among the "Information . . . provided to Insurers to support the assessment of the risk at the time of underwriting[.]" *See* First Layer Policy, at 24 (Dckt. No. 62-2, at 26 of 30); Second Layer Policy, at 11 (Dckt. No. 62-3, at 13 of 17); Third Layer Policy, at 11 (Dckt. No. 62-4, at 13 of 17).

The three tiers of insurance included one primary layer (the "First Layer") and two excess layers (the "Second and Third Layers"). The insured needed to exhaust the First Layer before tapping into the Second Layer, and so on. The Second Layer would kick in after the exhaustion of the First Layer (and not before), and the Third Layer would come into play after the exhaustion of the Second Layer. *See* Second Am. Cplt. ¶¶ 20–23. All together, there was $25 million in coverage. The First Layer had a policy limit of $5 million, the Second Layer covered the next $10 million, and the Third Layer covered the final $10 million. *Id.*; *see also* Second Layer Policy, at 1 of 14 (Dckt. No. 62-3, at 3 of 17) (providing a $10 million liability limit, "[e]xcess of the underlying limits" of $5 million); Third Layer Policy, at 1 of 14 (Dckt. No. 62-4,

at 3 of 17) (providing a $10 million liability limit, "[e]xcess of the underlying limits" of $15 million).

The First Layer coverage is provided by Lloyd's Syndicate 2003 SJC (the "First Layer Insurer"). *See* Second Am. Cplt. ¶ 20. The First Layer insurer is not a defendant in this litigation. Plaintiffs sued only the excess carriers, meaning the Second and Third Layer insurers.

The Second Layer has two insurers, and so does the Third Layer, so there are four insurers (total) for those two excess layers. The Second Layer insurers are ANV Corporate Name Limited the Underwriting Member of ANV Syndicate 1861 at Lloyd's for the 2014 Year of Account ("ANV") and PartnerRe Ireland Insurance DAC ("PartnerRe") (collectively, the "Second Layer"). *Id.* at ¶ 21. The Third Layer insurers are AXIS Specialty Europe SE ("AXIS") and Navigators Underwriting Agency Limited for and on behalf of the Underwriting Members of Syndicate 1221 at Lloyd's for the 2014 Year of Account ("Navigators") (collectively, the "Third Layer"). *Id.* at ¶ 22. That is, ANV and PartnerRe are the Second Layer insurers, and AXIS and Navigators are the Third Layer insurers.

## C. The State Court Suit and the Federal Court Suit

Three months after buying insurance, the other shoe dropped. The former IREH minority unitholders challenged the Minority Buyout by filing a putative class action in the Circuit Court for Ogle County, Illinois, *Schultz, et al. v. Sinav Ltd., et al.*, Case No. 2014 L 15 (the "Underlying Action"). *Id.* at ¶¶ 1, 25, 27. The minority unitholders sued the majority unitholder managers – Ruebe, Lemajeur, Kwasniewski, and Jakel – meaning the four Plaintiffs in the case before this Court. The minority owners claimed that the majority board members had breached IREH's LLC agreement and breached their fiduciary duties. *Id.* at ¶ 27.

Ruebe, Lemajeur, Kwasniewski, and Jakel tendered a claim for defense to the First Layer insurer. That insurer agreed to defend them in the Underlying Action. *Id.* at ¶¶ 35–36.

6

It was a different story with the Second and Third Layer insurers. Long before the exhaustion of the First Layer (which still isn't exhausted), the four Plaintiffs "tendered the claim of the Underlying Action to the Defendants [the Second and Third Layer insurers] in order to confirm that they would provide a defense, indemnity, and cover any losses of the Individual Insureds within the liability limits of the Excess Policies." *Id.* at ¶ 38. In response, the Second and Third Layer insurers did not offer any assurances that they would provide coverage someday.

The Second Layer insurers responded that they owed no coverage at all because Sinav had breached a warranty in the Proposal Form. *See* Second Layer 9/2/14 Letter (Dckt. No. 62-5); Second Layer 11/25/14 Letter (Dckt. No. 62-7); *see also* Second Layer 1/13/15 Letter (Dckt. No. 62-8). The Second Layer insurers took the position that Sinav had misrepresented the facts when it promised that it was not "aware, after enquiry, of any circumstance or incident, which may give rise to a claim against any Director or Officer of the Company in such capacity[.]" *See* Proposal Form, at § 6 (Dckt. No. 62-1, at 4 of 71); Second Layer 9/2/14 Letter, at 1–2 (Dckt. No. 62-5, at 2–3 of 4); Second Layer 11/25/14 Letter, at 1–2 (Dckt. No. 62-7, at 2–3 of 5); Second Layer 1/15/15 Letter (Dckt. No. 62-8). In their view, Plaintiffs knew that a claim about the Minority Buyout was possible, if not highly probable. *See* Second Layer 9/2/14 Letter, at 1–2 (Dckt. No. 62-5, at 2–3 of 4). As they see it, they have no obligation to provide coverage for potential claims that Plaintiffs knew about, but failed to disclose.

The Third Layer insurers took a different approach. They denied that the tender of coverage was effective because it was not yet their turn to provide coverage. *See* Third Layer Answer to Second Am. Cplt. ¶ 38 (Dckt. No. 72). "[T]he claim could not be tendered until the primary policy and first excess policy had been exhausted, which has not occurred." *Id.*

In April 2017, the four Plaintiffs invited the Second and Third Layer insurers to a mediation about the Underlying Action. *See* April-May 2017 Third Layer Email Correspondence with Pls. (Dckt. No. 62-12); Pls.' 4/17/17 Letter to Second Layer (Dckt. No. 62-9). The insurance policies required Plaintiffs to invite the Second and Third Layer insurers, who were "entitled to participate fully in . . . the negotiation of any settlement that involves or appears reasonably likely to involve [them]." *See* First Layer Policy, at § 5.10 (Dckt. No. 62-2, at 18 of 30); Second Layer Policy, at 1 of 14 (Dckt. No. 62-3, at 3 of 17) (incorporating this term from the First Layer Policy); Third Layer Policy, at 1 of 14 (Dckt. No. 62-4, at 3 of 17) (same).

The Second and Third Layer insurers declined to participate in the mediation, for different reasons. The Second Layer insurers refused for the same reason that they had denied coverage: in their view, Sinav had breached a warranty in the Proposal Form. *See* Second Layer 4/27/17 Letter (Dckt. No. 62-10).

The Third Layer insurers were a bit cagier in their response. They declined because they did not think the Underlying Action "could give rise to an exposure that would impact the [Third Layer] Policy." *See* April-May 2017 Third Layer Email Correspondence with Pls., at 2 (Dckt. No. 62-12, at 3 of 5). The Third Layer insurers were non-committal about their coverage position, and they made a point of distancing themselves from the Second Layer insurers. "We note that you [Plaintiffs] principally address issues arising out of correspondence relating to Policy No. B0180PE1400607 [the Second Layer Policy]. As you will be aware, we did not underwrite that policy and we have not (contrary to your comments) stated a position in relation to the policy to which we do subscribe," *i.e.*, the Third Layer Policy. *Id.* The Third Layer insurers staked out neutral territory: "we are unable to state a position in relation to the [Third Layer] Policy, and see no need to attend the mediation." *Id.*

8

Plaintiffs went to the mediation in the Underlying Action in May 2017, without the Second or Third Layer insurers. The parties did not settle. Plaintiffs later blamed the Second and Third Layer insurers for the failed mediation: "Defendants' refusal to attend the mediation and participate in the settlement discussions prevented the parties from engaging in meaningful settlement negotiations and/or reaching an agreement to resolve the Underlying Action." *See* Second Am. Cplt. ¶ 42. The Underlying Action therefore continued. The parties exchanged discovery and filed summary judgment briefs. *Id.* at ¶ 52.

Meanwhile, Plaintiffs Ruebe, Lemajeur, Kwasniewski, and Jakel filed this coverage action in February 2018. In the Second Amended Complaint, they seek a declaration that the Second and Third Layer Policies cover the Underlying Action, once the First Layer is exhausted (Count I). They also bring claims for anticipatory breach of contract (Count II) and breach of contract (Count III), as well as a statutory bad faith insurance claim under Section 155 of the Illinois Insurance Code, 215 ILCS 5/155 (Count IV). *See* Second Am. Cplt. (Dckt. No. 62).

Two months after filing this lawsuit, the Illinois state court ruled on the summary judgment motions in the Underlying Action. *See* Second Am. Cplt. ¶ 52; *see also* Underlying Action S. J. Order (Dckt. No. 79-1). The court ruled against the majority unitholder managers, meaning the Plaintiffs in this litigation (and the defendants in the Underlying Action). The state court found them liable, ruling that they had breached IREH's LLC agreement and breached their fiduciary duties during the Minority Buyout. *See* Underlying Action S. J. Order, at 48.

**Analysis**

There are two pending motions, one by each level of excess insurer.

The Third Layer insurers moved to dismiss all claims in the Second Amended Complaint, except the claim for declaratory judgment. *See* Third Layer Mot. to Dismiss (Dckt. No. 29).[1] Their main argument involves a failure to exhaust. The Third Layer insurers basically argue that they have not breached the contract because Plaintiffs have not yet exhausted the First and Second Layers of coverage. Also, they argue that they never took a firm position on whether they would owe coverage if the First and Second Layers were exhausted. So they did not commit anticipatory breach because they left their options open. Finally, they argue that they had no obligation to attend the mediation.

Unlike the Third Layer insurers, the Second Layer insurers didn't file a motion to dismiss. Instead, they moved for judgment on the pleadings, arguing that Sinav's breach of warranty in the Proposal Form absolved them of any coverage obligations under the policies. *See* Second Layer Mot. for J. on the Pleadings (Dckt. No. 79). The Third Layer insurers also joined the motion for judgment on the pleadings. *See* Dckt. Nos. 100, 102.

In the meantime, the First Layer insurer continues to pay for Plaintiffs' defense costs in the Underlying Action. *See* Second Am. Cplt. ¶ 37. As things stand, Plaintiffs have not yet exhausted the First Layer policy, although Plaintiffs alleged in the Second Amended Complaint that they are "nearing the First Layer's coverage limits." *Id.* at ¶ 53; *see also* 5/6/20 Joint Status Report (Dckt. No. 132) (omitting any update on whether Plaintiffs have now exhausted the First Layer of insurance).

---

[1] Plaintiffs amended their complaint after the Third Layer insurers moved to dismiss, *see* Second Am. Cplt. (Dckt. No. 62), but the Third Layer insurers later renewed their motion to dismiss, and all parties agreed to stand on their pre-amendment briefing. *See* Dckt. No. 76.

## I.     Motion to Dismiss by the Third Layer Insurers

The Third Layer insurers move to dismiss Plaintiffs' claims for breach of contract, anticipatory breach of contract, and bad faith refusal of insurance coverage under 215 ILCS 5/155.  The Third Layer insurers argue that Plaintiffs are jumping the gun by advancing a claim for coverage before coverage is due.  The Court agrees.

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case.  *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990).  In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).  To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

At the outset, the Court notes that the parties rely on Illinois law for the breach of contract and anticipatory breach of contract claims.  *See* Third Layer Mot. to Dismiss, at 4–6 (Dckt. No. 29); Pls.' Opp. to Mot. to Dismiss, at 4–8 (Dckt. No. 47) (citing no law in support of breach of contract claim, and citing Illinois law in support of anticipatory breach of contract claim).  Yet the choice-of-law provision in the policies provides that "[a]ny interpretation of this policy or issue relating to its construction, validity or operation shall be determined by the laws of England and Wales."  *See* First Layer Policy, at § 5.22 (Dckt. No. 62-2, at 20 of 30).  All parties agree that the choice-of-law provision is valid and generally applies to this dispute.  *See*

Third Layer Mot. to Dismiss, at 8–9; Pls.' Opp. to Mot. to Dismiss, at 10–12; *see also* Pls.' Opp. to Mot. for J. on the Pleadings, at 4–5 (Dckt. No. 85, at 5–6 of 18).

The parties don't explain their reliance on Illinois law when the choice-of-law provision points to English and Welsh law. Maybe the parties agree that the choice-of-law provision doesn't come into play because the claims don't involve a dispute about the interpretation, construction, validity, or operation of the policies. Or maybe the parties agree that the choice-of-law provision makes no difference because Illinois law is the same as English and Welsh law (at least on these issues, anyway). In any event, the Court follows suit and applies Illinois law to the contractual claims. *See Selective Ins. Co. of S.C. v. Target Corp.*, 845 F.3d 263, 266 (7th Cir. 2016), *as amended* (Jan. 25, 2017) ("If no party raises a choice of law issue to the district court, the federal court may simply apply the forum state's substantive law.") (cleaned up); *Bowers v. Fed'n Internationale de l'Autombile*, 489 F.3d 316, 323 n.4 (7th Cir. 2007) (holding that "the parties' silence forfeits choice-of-law issues").

In Illinois, an insured must exhaust primary coverage before the excess insurers owe anything. "Excess insurance coverage 'attaches only after a predetermined amount of primary insurance or self-insured retention has been exhausted.'" *Kajima Const. Servs., Inc. v. St. Paul Fire & Marine Ins. Co.*, 227 Ill. 2d 102, 114, 316 Ill. Dec. 238, 879 N.E.2d 305 (2007) (quotation omitted); *SwedishAmerican Hosp. Ass'n of Rockford v. Illinois State Med. Inter-Ins. Exch.*, 395 Ill. App. 3d 80, 106, 916 N.E.2d 80, 334 Ill. Dec. 47 (2009) (same); *see also Lexington Ins. Co. v. RLI Ins. Co.*, 949 F.3d 1015, 1018 (7th Cir. 2020) (citing *Kajima Const. Servs.*, 227 Ill. 2d at 114); *Fox v. Am. Alternative Ins. Corp.*, 757 F.3d 680, 684 (7th Cir. 2014) ("Under both [the excess insurer's] policy and Illinois law it, as an *excess* insurer, had no duty to defend the [insureds] until [the primary insurer] exhausted its policy limits . . . .") (emphasis in

original; citations omitted). Under Illinois law, a "policy holder or primary insurer must show that all triggered primary policies are exhausted before any excess insurance policies can be required to respond to the claim." *John Crane, Inc. v. Admiral Ins. Co.*, 2013 IL App (1st) 1093240-B, ¶ 60, 372 Ill. Dec. 167, 991 N.E.2d 474, 492 (2013); *see also Kajima Const. Servs.*, 227 Ill. 2d at 117; *Essex Ins. Co. v. Vill. of Oak Lawn*, 189 F. Supp. 3d 779, 791 (N.D. Ill. 2016) (citation omitted); *Homeland Ins. Co. of New York v. Health Care Serv. Corp.*, 330 F.R.D. 180, 181–82 (N.D. Ill. 2019) ("The Homeland policy is a second-layer excess policy that provides coverage only when two underlying policies are exhausted . . . .").

Excess policy coverage "protects an insured in those instances where a judgment or a settlement exceeds the primary policy's limits of liability." *See Roberts v. Northland Ins. Co.*, 185 Ill. 2d 262, 276–77, 235 Ill. Dec. 579, 705 N.E.2d 762 (1998) (Freeman, C.J., concurring in part and dissenting in part) (cited with approval in *Kajima Const. Servs.*, 227 Ill. 2d at 114). As the names suggest, the primary policy is primary, and the excess policy is excess. The primary insurer goes first, and the excess insurer goes second.

Plaintiffs recognize that the Second and Third Layers are excess insurance policies that are triggered "once the coverage limit of the First Layer, which is $5 million, is exhausted." *See* Second Am. Cplt. ¶ 23; *see also* Third Layer Policy, at 1 of 14 (Dckt. No. 62-4, at 3 of 17) (providing coverage "[e]xcess of the underlying limits"). Plaintiffs also acknowledge that they have not yet exhausted the First Layer insurance coverage. *See* Second Am. Cplt. ¶ 53.

So, under Illinois law, the Third Layer insurers are not yet up to bat. Indeed, they are not even warming up in the on-deck circle. True, Plaintiffs allege that they are "nearing the First Layer's coverage limits." *Id.* But Plaintiffs must exhaust the Second Layer, too, before triggering the Third Layer. And the Second Layer provides a buffer of $10 million. *See* Second

Layer Policy, at 1 of 14 (Dckt. No. 62-3, at 3 of 17) (providing a $10 million liability limit, "[e]xcess of the underlying limits" of $5 million). At this point, there is a long way to go before the Third Layer's obligations come into play.

A breach of contract claim requires, of course, a breach of a duty by the defendant. *See Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 614 (7th Cir. 2019) (citations omitted). Until Plaintiffs exhaust the underlying insurance coverage, the Third Layer insurers have no duty to perform under the policy. *See Kajima Const. Servs.*, 227 Ill. 2d at 114; *see also* 14 Steven Plitt, *et al.*, *Couch on Ins.* § 200:39 (2020) ("As a general rule, a true-excess insurer is not obligated to defend its insured until all primary insurance is exhausted or the primary insurer has tendered its policy limits."); 4 Douglas R. Richmond, *New Appleman on Insurance Law Library Edition* § 24.06[1] (2019) ("Generally, the primary insurer must pay its policy limits toward the satisfaction or settlement of the claim or judgment against the insured for an excess insurer to have any obligation to its insured."). Without a duty to provide coverage, the Third Layer insurers cannot breach a duty to provide coverage.

Plaintiffs next argue anticipatory breach. They argue that they tendered a claim to the Second and Third Layer insurers for defense in the Underlying Action, and the excess insurers "absolutely and unequivocally made clear that they will not grant coverage under the Excess Policies for any defense, indemnity or losses . . . ." *See* Second Am. Cplt. ¶ 41. Plaintiffs rely on exhibits to the complaint, which are deemed part of the pleading itself. *See* Fed. R. Civ. P. 10(c); *Chicago Faucet Shoppe, Inc. v. Nestle Waters N. Am. Inc.*, 24 F. Supp. 3d 750, 755 (N.D. Ill. 2014) ("Exhibits attached to a complaint become part of the pleadings, . . . and can be considered on a motion to dismiss.") (citations omitted). That is, Plaintiffs attach "correspondence" that, in their view, demonstrates that the Third Layer insurers refused

coverage. *See* Second Am. Cplt. at ¶¶ 39–41; *see also* Second Layer 9/2/14 Letter (Dckt. No. 62-5); Second Layer 11/25/14 Letter (Dckt. No. 62-7); Second Layer 1/13/15 Letter (Dckt. No. 62-8); April-May 2017 Third Layer Email Correspondence with Pls. (Dckt. No. 62-12).

The correspondence is not so clear cut. An anticipatory breach takes place when there is a "definite and unequivocal intent not to render its performance under the contract once the time fixed in the contract arrived." *See Bituminous Cas. Corp. v. Commercial Union Ins. Co.*, 273 Ill. App. 3d 923, 927, 210 Ill. Dec. 216, 652 N.E.2d 1192 (1995) (citation omitted).

The Second Layer insurers and the Third Layer insurers did not respond in unison. The Second Layer insurers did refuse coverage. *See* Second Layer 9/2/14 Letter (Dckt. No. 62-5); Second Layer 11/25/14 Letter (Dckt. No. 62-7); *see also* Second Layer 1/13/15 Letter (Dckt. No. 62-8). But they spoke for themselves only, as the first letter made clear. "We act for PartnerRe and ANV, the excess layer insurers . . . ." *See* Second Layer 9/2/14 Letter, at 1 (Dckt. No. 62-5, at 2 of 4). PartnerRe and ANV are the Second Layer insurers, not the Third Layer insurers. The amended complaint lumps all of the excess carriers together, *see* Second Am. Cplt. ¶ 39, but the letter itself did the opposite.

Unlike the Second Layer insurers, the Third Layer insurers waffled. The Third Layer insurers told Plaintiffs that "we have not (contrary to your comments) stated a position in relation to" whether the Third Layer Policy would provide coverage. *See* April-May 2017 Third Layer Email Correspondence with Pls., at 2 (Dckt. No. 62-12, at 3 of 5). They were "unable to state a position in relation to the [Third Layer] Policy . . . ." *Id.*

An anticipatory breach exists when a party is "definite and unequivocal," but here, the Third Layer insurers equivocated. *See Bituminous Cas. Corp.*, 273 Ill. App. 3d at 927. The complaint alleges that the Third Layer insurers unequivocally denied coverage, but the exhibit to

the complaint shows otherwise. When a complaint is at odds with one of its own exhibits, the exhibit typically prevails. "When an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss." *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) (citation omitted); *see also Johnson v. Carrington Mortg. Servs.*, 638 F. App'x 523, 525 (7th Cir. 2016) ("[A]n attached exhibit of unquestioned veracity that contradicts an allegation in a complaint overrides that allegation if, as here, the complaint refers to the subject of the exhibit and that subject is central to the claim.") (citations omitted). Simply put, the exhibit to the complaint undermines the complaint's allegation that the Third Layer insurers definitively abandoned coverage once and for all.

Finally, Plaintiffs contend that the Third Layer insurers breached the contract by refusing to participate in mediation related to the Underlying Action. *See* Second Am. Cplt. ¶¶ 42, 79, 87–89. Once again, Plaintiffs rely on attachments to the complaint. The correspondence shows that the Third Layer insurers declined to attend the mediation, saying that they did not believe the Underlying Action "could give rise to an exposure that would impact the [Third Layer] Policy." *See* April-May 2017 Third Layer Email Correspondence with Pls., at 2 (Dckt. No. 62-12, at 3 of 5).

A failure to attend the mediation was not a breach of the policy. As the plain text reveals, the policy gave the Third Layer insurers the *right*, but not the *obligation*, to attend any settlement talks. "The **insurer** shall be *entitled* to participate fully in such defence and in the negotiation of any settlement that involves or appears reasonably likely to involve the **insurer**." *See* First Layer Policy, at § 5.10 (Dckt. No. 62-2, at 18 of 30) (italics added; bold in original); Third Layer Policy, at 1 of 14 (Dckt. No. 62-4, at 3 of 17) (incorporating this term from the First Layer

Policy).  The insurers had a right to participate in the mediation because they might have to foot the bill someday.  But they didn't have a *duty* to participate.

Plaintiffs have not identified any provision of the policy that required the Third Layer insurers to participate in the mediation.  The language that does appear in the policy is a one-way option that does not compel attendance.  *See Thompson v. Gordon*, 241 Ill. 2d 428, 441, 349 Ill. Dec. 936, 948 N.E.2d 39 (2011) ("If the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning.") (citation omitted).  The Third Layer insurers therefore had no obligation to attend settlement talks.  And without a duty to attend, the refusal to attend cannot be a breach.

The allegations in the Second Amended Complaint, and the documents attached to it, establish that the Third Layer insurers have not breached (or anticipatorily breached) the policy. Counts II and III against the Third Layer insurers are therefore dismissed without prejudice.  The time is not yet ripe for a breach of contract claim against them.  If Plaintiffs exhaust the First and Second Layer insurance policies, and the Third Layer insurers refuse coverage, Plaintiffs may resurrect the claim.

Finally, the Third Layer insurers moved to dismiss Count IV, the statutory bad faith claim for unreasonably refusing coverage under 215 ILCS 5/155.  Again, that claim fails on ripeness grounds because the duty to provide coverage has not yet come into play.  But the claim also fails for a more basic reason:  it is not a claim at all.

The Illinois statute creates remedies, not a cause of action.  It authorizes an insured to recover attorneys' fees, costs, and penalties if an insurer unreasonably refuses or delays coverage:

> (1) In any action by or against a company wherein there is in issue
> the liability of a company on a policy or policies of insurance or the

17

amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:

> (a) 60% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;

> (b) $60,000;

> (c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action.

*See* 215 ILCS 5/155. So, the statute provides for recovery of certain "taxable costs" against an insurer in "any action" where the insurer is being "vexatious and unreasonable." *Id.*

The Seventh Circuit has held that this statute merely provides an extracontractual *remedy* in an insurance action, not a separate, standalone *cause of action* against an insurer. *See Hennessy Indus., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 770 F.3d 676, 679–80 (7th Cir. 2014); *see also Cramer v. Ins. Exch. Agency*, 174 Ill. 2d 513, 523, 675 N.E.2d 897, 902 (1996) ("The statute [215 ILCS 5/155] simply provides an extracontractual remedy to an action on a policy.").

Count IV is therefore dismissed as to all Defendants because it is not a freestanding cause of action under Illinois law. If the time comes, Plaintiffs can seek remedies under the statute on their other claims.

## II. Motion for Judgment on the Pleadings by the Second Layer Insurers

Instead of moving to dismiss, the Second Layer insurers move for judgment on the pleadings. *See* Second Layer Mot. for J. on the Pleadings (Dckt. No. 79). The insurers make two arguments.

18

First, the Second Layer insurers argue that Plaintiffs breached a warranty in the Proposal Form. In the application, Sinav answered "No" when asked if it was aware of any potential claims. But in the complaint, Plaintiffs acknowledged that they knew about discontent over the Minority Buyout. So, as the insurers see it, Plaintiffs admitted that they knew about potential claims, and thus defeated their own complaint. Plaintiffs admitted a breach of warranty.

Despite filing a motion for judgment on the pleadings, the insurers quickly leave the pleadings behind. The insurers put forward a collection of material from the state court case. That extrinsic evidence, the insurers argue, shows that the information in the Proposal Form was false. They rely on evidence outside the pleadings to support a motion for judgment on the pleadings.

Second, the Second Layer insurers argue that an exclusion applies. The policy excludes coverage for claims involving intentional dishonesty or fraud. The insurers argue that the exclusion bars coverage for the state court case, which involved claims for breach of contract and breach of fiduciary duty. Once again, the insurers rely on extrinsic evidence with no foothold in the complaint.

Both arguments rely primarily on material outside the pleadings, so the Court denies the motion for judgment on the pleadings.

### A.      Legal Standard for Judgment on the Pleadings

A party may move for judgment on the pleadings any time after the pleadings are closed. *See* Fed. R. Civ. P. 12(c); *Moss v. Martin*, 473 F.3d 694, 698 (7th Cir. 2007). The standard is the same as the standard for a motion to dismiss under Rule 12(b)(6). *See Armada (Singapore) PTE Ltd. v. Amcol Int'l Corp.*, 885 F.3d 1090, 1092 (7th Cir. 2018). "To survive a motion for judgment on the pleadings, a complaint must state a claim to relief that is plausible on its face." *Denan v. Trans Union LLC*, 959 F.3d 290, 293 (7th Cir. 2020) (cleaned up).

19

The Court takes all well-pled facts as true. *See Forseth v. Vill. of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000). And the Court "view[s] the facts in the complaint in the light most favorable to the nonmoving party and will grant the motion only if it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief."[2] *Denan*, 959 F.3d at 293 (cleaned up); *see also* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1368 (3d ed. 2020) ("[A]ll of the well pleaded factual allegations in the adversary's pleadings are assumed to be true and all contravening assertions in the movant's pleadings are taken to be false."). Legal conclusions don't move the needle – the Court need not accept any legal assertions as true. *Bishop v. Air Line Pilots Ass'n Int'l*, 900 F.3d 388, 397 (7th Cir. 2018); *see also Buchanan–Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009).

A motion for judgment on the pleadings is a better way to raise affirmative defenses than a motion to dismiss. "The proper way to seek a dismissal based on an affirmative defense under most circumstances is not to move to dismiss under Rule 12(b)(6) for failure to state a claim. Rather, the defendant should answer and then move under Rule 12(c) for judgment on the pleadings." *Burton v. Ghosh*, 2020 WL 3045954, at *3 (7th Cir. 2020) (citation omitted); *see also Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 645 (7th Cir. 2019) (stating

---

[2] In *Twombly*, the Supreme Court jettisoned the "no set of facts" phraseology in the context of a motion to dismiss under Rule 12(b)(6), a phrase popularized by *Conley*. *See Bell Atl. v. Twombly*, 550 U.S. 544, 563 (2007) ("[A]fter puzzling the profession for 50 years, this famous observation has earned its retirement."); *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957) ("In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."). "A motion for judgment on the pleadings is subject to the same standard as a motion to dismiss under Rule 12(b)(6)." *Gill v. County of Milwaukee*, 850 F.3d 335, 339 (7th Cir. 2017). Even so, the any-set-of-facts language persists in the case law about motions for judgment on the pleadings, even though *Twombly* tightened the language for motions to dismiss. *See, e.g., Denan v. Trans Union LLC*, 959 F.3d 290, 293 (7th Cir. 2020); *Landmark Am. Ins. Co. v. Hilger*, 838 F.3d 821, 824 (7th Cir. 2016); *Hayes v. City of Chicago*, 670 F.3d 810, 813 (7th Cir. 2012). Perhaps the language in the context of a motion for judgment on the pleadings could use comparable tightening. But the upshot is the same: to prevail on a motion for judgment on the pleadings, the argument must be a clear winner, based on the pleadings themselves.

that a Rule 12(c) motion is the "more appropriate way to address an affirmative defense"); 5C

Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1367 (3d ed. 2020).

"[A] complaint that alleges an impenetrable defense to what would otherwise be a good claim

should be dismissed (on proper motion) under Rule 12(c)." *Richards v. Mitcheff*, 696 F.3d 635,

637–38 (7th Cir. 2012).

But the defense must be "impenetrable." *Id.* Judgment on the pleadings is proper only if

plaintiff's allegations "show that there is an airtight defense [such that he] has pleaded himself

out of court." *Id.* That is, it must be "beyond doubt" that the plaintiff cannot prevail. *Denan*,

959 F.3d at 293 (quoting *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir.

2009)); *see also Edgenet, Inc. v. Home Depot U.S.A., Inc.*, 658 F.3d 662, 665 (7th Cir. 2011)

("When the complaint itself contains everything needed to show that the defendant must prevail

on an affirmative defense, then the court can resolve the suit on the pleadings under Rule 12(c).")

(citation omitted). Judgment on the pleadings therefore "only has utility when all material

allegations of fact are admitted or not controverted in the pleadings and only questions of law

remain to be decided by the district court." 5C Charles Alan Wright & Arthur R. Miller, *Federal

Practice & Procedure* §1367 (3d ed. 2020); *see also Burns v. Vill. of Crestwood*, 2013 WL

352784, at *3–4 (N.D. Ill. 2013) (denying judgment on the pleadings due to factual dispute);

*Drabik v. Drabik*, 2013 WL 2285791, at *1–2 (N.D. Ill. 2013) (same).

A motion for judgment on the pleadings is reserved for self-defeating complaints.

Sometimes a complaint will contain a fatal defect that dooms any viable claim. In that case, the

complaint cannot get off the ground. But a motion for judgment on the pleadings is not the time

to resolve factual disputes. And it is not the time for a defendant to press its defenses, unless the

pleadings themselves show that the defense is a clear-cut, cut-and-dry, knock-out winner with no way out for the plaintiff.

As the name suggests, a motion for judgment on the pleadings depends on the content of the pleadings alone. *See N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998). The pleadings include the complaint, the answer, and any accompanying written instruments attached as exhibits. *Id.* at 452–53; *see also Arethas v. S/TEC Grp., Inc.*, 2005 WL 991782, at *6 (N.D. Ill. 2005) ("[A]lthough in ruling on a motion for judgment on the pleadings a court can consider affidavits attached to a complaint or an answer to the complaint, a court cannot consider affidavits that are not a part of the pleadings."). Also, "documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." *Wright v. Assoc. Ins. Cos., Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994); *see also Curry v. City of Chicago*, 2013 WL 884454, at *2 (N.D. Ill. 2013) (applying rule on motion for judgment on the pleadings). Courts also may take judicial notice of appropriate materials, such as "documents that are critical to the complaint and referred to in it," *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012), "proceedings in other courts, both within and outside of the federal judicial system, if the proceedings have a direct relation to matters at issue," *Green v. Warden, U.S. Penitentiary*, 699 F.2d 364, 369 (7th Cir. 1983), and certain matters of public record. *See, e.g., Pickett v. Sheridan Health Ctr.*, 664 F.3d 632, 648 (7th Cir. 2011).

A motion for summary judgment, not a motion for judgment on the pleadings, is the right procedural path when a movant relies on material outside the pleadings. "If a party believes that it will be necessary to introduce evidence outside the formal pleadings in order to demonstrate that no material issue of fact exists and he is clearly entitled to judgment, it is advisable to

proceed directly under Rule 56 rather than taking the circuitous route through Rule 12(c)." *See* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1369 (3d ed. 2020).

If a court considers material outside the pleadings, the court must convert the motion for judgment on the pleadings into a motion for summary judgment and allow all parties a reasonable opportunity to present evidence, including "all the material that is pertinent to the motion." *See* Fed. R. Civ. P. 12(d); *see also Rutherford v. Judge & Dolph Ltd.*, 707 F.3d 710, 713–14 (7th Cir. 2013). The Federal Rules vest district courts with discretion to convert (or not convert) a motion for judgment on the pleadings to a motion for summary judgment. *See* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1371 (3d ed. 2020) ("[I]t is well-settled that it is within the district court's discretion whether to accept extra-pleading matter on a motion for judgment on the pleadings and treat it as one for summary judgment or to reject it and maintain the character of the motion as one under Rule 12(c)."). But conversion is no sure thing, especially when the facts seem up in the air. The "Rule 12(c) path may present certain risks because the court, in its discretion, may refuse to permit the introduction of matters beyond the pleadings and insist on treating the motion as one under Rule 12(c)." *Id.* at § 1369.

### B. Breach of Warranty Defense

The Second Layer insurers argue that the Proposal Form created a warranty that Sinav was not aware of any potential claims. Sinav breached that warranty, they argue, by failing to disclose potential claims about the Minority Buyout. So, as they see it, the insurers don't owe any coverage under the policy.

Ordinarily, a jury would decide whether an insured was aware of circumstances that might give rise to a claim, meaning that the insured knew something that it needed to disclose to

a potential insurer. But the Second Layer insurers argue that they are entitled to prevail – right here, right now – based on the complaint itself. In their view, Plaintiffs admit in the complaint that they were aware of potential claims, and therefore admit that they breached a warranty.

The Court concludes that the Proposal Form created a warranty within the meaning of English and Welsh law. But the allegations of the complaint, standing alone, do not establish a breach of warranty. Whether Sinav breached the warranty will depend on the facts, not merely the pleadings, and thus is a question for another day.

### 1.    Warranty Language in the Insurance Application

The first question is whether language in the insurance application – the Proposal Form – created a warranty under English and Welsh law. All parties agree that the policy contains a valid choice-of-law provision and that the law of England and Wales governs. *See* Second Layer Mot. for J. on the Pleadings, at 5 (Dckt. No. 79, at 6 of 18); Pls.' Opp. to Mot. for J. on the Pleadings, at 4–5 (Dckt. No. 85, at 5–6 of 18). But unlike the briefs on the motion to dismiss – which nevertheless applied Illinois law – the briefs on the motion for judgment on the pleadings rely on English and Welsh law when analyzing whether the Proposal Form created a warranty. *See* Second Layer Mot. for J. on the Pleadings, at 5–6; Pls.' Opp. to Mot. for J. on the Pleadings, at 8–9.

This is a diversity case, so the Court applies the choice-of-law rules of Illinois, the forum state. *See NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 300 (7th Cir. 2018) (citation omitted), *reh'g denied* (Jan. 4, 2019). "Illinois courts usually enforce contractual choice-of-law provisions." *Id.* (citation omitted); *see also Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 357 (7th Cir. 2015) ("Under Illinois choice-of-law rules, which we apply as a federal court sitting in diversity, a court must honor a contractual choice of law unless the parties' choice of law would violate fundamental Illinois public policy and Illinois has a materially greater

interest in the litigation than the chosen state.").  So this Court will follow suit and apply the law of England and Wales.

The dispute largely turns on the following language in the Proposal Form, which appears just above the signature block:  "We agree that this Proposal, together with any other information supplied by us shall form the basis of any contract of insurance effected thereon."  *See* Proposal Form, at 4 (Dckt. No. 62-1, at 5 of 71).  Courts applying English and Welsh law have held that this language – specifically, the phrase "shall form the basis of any contract of insurance" – is a so-called "basis clause," which transforms the representations in the proposal into warranties.[3] *See Genesis Housing Ass'n Ltd. v. Syndicate Mgmt. Ltd.* [2013] EWCA Civ 1173, at ¶¶ 50–58 (Dckt. No. 79-6); *Dawsons Ltd. v. Bonnin* [1922] 2 A.C. 413, at 425 (Dckt. No. 79-5) ("[W]hen answers . . . are declared to be the basis of the contract this can only mean that their truth is made a condition exact fulfillment of which is rendered by stipulation foundational to its enforceability."); *id.* at 435 ("I think that 'basis' cannot be taken as merely pleonastic and exegetical of the following words, 'and incorporated therewith.'  It must mean that the parties held that these statements are fundamental – i.e., go to the root of the contract – and that consequently if the statements are untrue the contract is not binding.").

A basis clause imports the warranties in an application into the follow-on insurance contract.  "[W]here a proposal form contains a 'basis of contract' clause, (i) the proposal form

---

[3]  The United Kingdom's Insurance Act 2015 later abolished the basis clause rule.  *See* Insurance Act 2015, § 9 (providing that a "representation[] made by the insured in connection with . . . a proposed non-consumer insurance contract . . . is not capable of being converted into a warranty by means of any provision of the non-consumer insurance contract (or of the terms of the variation), or of any other contract (and whether by declaring the representation to form the basis of the contract or otherwise)").  But the parties agree that the Insurance Act 2015 only applies to insurance contracts entered into, renewed, or varied on or after August 12, 2016.  *See* Pls.' Opp. to Mot. for J. on the Pleadings, at 9 n.9 (Dckt. No. 85, at 10 of 18); Second Layer Reply in Supp. of J. on the Pleadings, at 7 (Dckt. No. 87, at 8 of 18).  The parties entered into the policies in 2014, so the basis clause rule applies to this case.

has contractual effect even if the policy contains no reference to the proposal form; [and] (ii) all statements in the proposal form constitute warranties on which the insurance contract is based. They cannot therefore be treated as immaterial." *Genesis* [2013] EWCA Civ 1173, at ¶ 57. The basis-of-the-contract rule dates back 200 years, and is "not open to challenge." *Id.* at ¶¶ 58–59.

A basis clause has no obvious corollary in Illinois law.[4] But the idea is that a basis clause elevates information provided by the potential insured in an insurance application into a warranty. And if that information proves to be untrue, the insurer does not have to pay out under the policy. The scope is unforgiving, too – it does not matter if the information was immaterial, or if the breach was unrelated to the subsequent loss. *See HIH Cas. and Gen. Ins. Ltd v. New Hampshire Ins. Co & Ors* [2001] EWCA Civ 735, at 124 (Dckt. No. 79-10, at 34 of 57) ("[B]y being in breach of his warranty, an assured takes himself outside the cover which he has agreed with his insurer. . . . That is why the insurance ceases to bind even though any subsequent loss had nothing to do with the breach of warranty."); Merkin, *A Guide To Reinsurance Law*, 221 (1st ed. 2007) (Dckt. No. 87-5, at 12 of 17) ("It is a feature of English insurance law that a warranty need not be material to the risk."); R. A. Hasson, *The "Basis of the Contract Clause" in*

---

[4] In fact, the Court's own research has revealed few American authorities addressing "basis of the contract" language in applications for insurance. Two nineteenth-century Supreme Court opinions pull in opposite directions. In 1874, the Supreme Court held that such language converted representations in an insurance application into contractually material statements and conditions precedent to an insurer's acceptance of the risk, regardless of the purported immateriality of the insured's representations. *See Jeffries v. Econ. Life Ins. Co.*, 89 U.S. 47, 56 (1874). But thirteen years later, the Supreme Court held that similar language did not create a warranty, and that an insurer would need to prove materiality to avoid a policy based on an insured's misrepresentation in the application. *See Phoenix Mut. Life Ins. Co. v. Raddin*, 120 U.S. 183, 190–91 (1887). In the twentieth century, two Third Circuit opinions presented with basis clause language in an insurance application addressed insurer defenses based on a misrepresentation, not a breach of warranty. *See Parker Precision Prod. Co. v. Metro. Life Ins. Co.*, 407 F.2d 1070, 1072–74 (3d Cir. 1969); *Ostrov v. Metro. Life Ins. Co.*, 379 F.2d 829, 835 (3d Cir. 1967). The same is true for the only opinion applying Illinois law concerning an insurance application with a "basis of the contract" provision. *See Massachusetts Mut. Life Ins. Co. v. Reichenthal*, 138 F. Supp. 440 (S.D. Ill. 1956). All this is to say that the meaning of a basis clause under English and Welsh law appears to be a first for this Court.

*Insurance Law*, 34 Modern L. Rev. 29 (1971) ("An incorrect answer to any one of these questions is fatal to the insured's claim. This is so, whether he answered the question in good faith to the best of his knowledge, or, indeed, whether his response related to a material fact or not.").

Plaintiffs advance three arguments against interpreting the language in question as a basis clause. First, they argue that the phrase is too broad to be a basis clause. The clause says that "this Proposal, *together with any other information supplied by us* shall form the basis of any contract of insurance effected thereon." *See* Proposal Form, at 4 (Dckt. No. 62-1, at 5 of 71) (emphasis added). As Plaintiffs read it, the clause "attempts to convert every piece of information given to the insurers – no matter how trivial – into warranties." *See* Pls.' Opp. to Mot. for J. on the Pleadings, at 8 (Dckt. No. 85, at 9 of 18).

Plaintiffs point out that the basis clauses in *Genesis* and *Dawsons* were not so all-encompassing. They did not convert *all information* supplied by the insured into warranties. Instead, those clauses covered only the information in the proposal form itself. *See Genesis* [2013] EWCA Civ 1173, at ¶ 18 (Dckt. No. 79-6) ("Immediately above Mr[.] Gamby's signature, there is the following paragraph: . . . . [T]his proposal and the statements made therein shall form the basis of the contract between me/us and the Insurer."); *Dawsons* [1922] 2 A.C. 413, at 414 (Dckt. No. 79-5) ("The policy in its introductory clause contained the following parenthetical clause: 'Which proposal shall be the basis of this contract and be held as incorporated herein' . . . .").

Plaintiffs' argument is neither here nor there. This case doesn't involve whether information *outside* the insurance application created a warranty. That is, the Second Layer insurers aren't making an argument based on information outside the form itself. Instead, the

question is whether the representation in the insurance application – are you aware of any potential claims? – constituted a warranty. An argument about information that *isn't* in the application makes no difference, because this case involves information that *is* in the application.

Even then, Plaintiffs don't cite anything to support their overbreadth argument. They offer no support for the notion that adding "other information supplied" by the insured changes the character of the provision, and defrocks it as a basis clause. *See* Pls.' Opp. to Mot. for J. on the Pleadings, at 8–9 (Dckt. No. 85, at 9–10 of 18); *see also id.* at 9 n.9 (citing statutes that Plaintiffs acknowledge do not apply to this case). If the policy had simply read "this Proposal shall form the basis of any contract of insurance effected thereon," there would be little doubt that the provision would be a basis clause. It's hard to see how the clause could lose its status as a basis clause by including "other information" supplied by the insured. An expansive basis clause is still a basis clause. The language, unlike a balloon, does not burst when it expands.

At best, Plaintiffs make an argument about absurdity. They argue that the clause could not possibly elevate every trivial detail into a warranty. But that argument ignores the purpose of the basis clause rule: the Court need not ask whether the information is trivial or material. *See Genesis* [2013] EWCA Civ 1173, at ¶ 57 (Dckt. No. 79-6) (holding that "where a proposal form contains a 'basis of contract' clause," "all statements in the proposal form constitute warranties" and "cannot therefore be treated as immaterial"). Indeed, in *Dawsons*, the House of Lords addressed whether a basis clause elevated to a warranty an inadvertently false representation in the proposal form about where a truck insured against fire would be parked. *See Dawsons* [1922] 2 A.C. 413, at 414 (Dckt. No. 79-5). Lord Dunedin explained that "the evidence shows that the misstatement was not in fact material to the assessment of the premium." *Id.* at 434. Yet the court ruled that the basis clause transformed the immaterial representation about where the

truck would be parked into a warranty, thereby making it "contractually material." *Id.* at 435. "[I]t was within the power of parties to contract that particular matters, *however trivial*, might form conditions precedent." *See id.* (emphasis added, citation omitted).

Second, Plaintiffs argue that the sentence at issue cannot be a basis clause – even though it reads like one – because it would "nullify other Policy provisions . . . ." *See* Pls.' Opp. to Mot. for J. on the Pleadings, at 9 (Dckt. No. 85, at 10 of 18). Plaintiffs point to the "non-rescindable" clause, which provides that the "Insurer irrevocably waives any right it may have to rescind this policy on the grounds of non-disclosure or misrepresentation." *See* First Layer Policy, at § 5.3 (Dckt. No. 62-2, at 17 of 30).

A court should read language in a contract in harmony, when possible, and give effect to each of the provisions. *See Wood v. Capita* [2017] UKSC 24, [2017] AC 1173, at ¶ 10 (holding that the "court must consider the contract as a whole"); *Arnold v. Britton* [2015] AC 1619, at ¶ 15 (noting that the "meaning [of a contractual clause] has to be assessed in the light of . . . the natural and ordinary meaning of the clause, [and] any other relevant provisions" of the contract, among other factors).[5] When possible, a court should hear harmony, not dissonance.

Here, it is possible to read the two provisions harmoniously. The non-rescindable clause waives the insurer's remedy for non-disclosure or misrepresentation, not breach of warranty. To the American insurance ear, a representation and a warranty may sound similar, but they have different meanings under English and Welsh law. They are different defenses with different remedies.

---

[5] Although the Court applies English and Welsh law in construing the contractual language, the Illinois rules of contract interpretation are similar. *See INEOS Polymers Inc. v. BASF Catalysts*, 553 F.3d 491, 500 (7th Cir. 2009) (noting the Illinois "principle of contract interpretation" that "'meaning and effect must be given to every part of the contract including all its terms and provisions, so no part is rendered meaningless or surplusage unless absolutely necessary'") (quoting *Coles-Moultrie Elec. Co-op. v. City of Sullivan*, 304 Ill. App. 3d 153, 159, 237 Ill. Dec. 263, 709 N.E.2d 249 (1999)) (other citation omitted).

Under the law of England and Wales, non-disclosure and misrepresentation are not the same thing as a breach of warranty. An insured must disclose "every material circumstance which is known to the [in]sured" before purchasing the policy. *See* Marine Insurance Act 1906, at § 18(1). A material circumstance is one that "would influence the judgment of a prudent insurer in fixing the premium, or determining whether he will take the risk." *Id.* at § 18(2). If the insured misrepresents a material circumstance, or fails to disclose it, then "the insurer may avoid the contract." *Id.* at § 18(1). Note the option – the insurer "may" avoid the contract.

So, if the insured is guilty of non-disclosure or misrepresentation, the insurer has the option of rescinding the contract – *i.e.*, treating the policy as if it never existed. *See HIH Casualty* [2001] EWCA Civ 735, at 124 (Dckt. No. 79-10, at 34 of 57). But the insurer has to take action to rescind the policy. *See id.* "[I]n the case of non-disclosure or misrepresentation, nothing happens unless the insurer elects to avoid the contract, in which case the contract is not discharged for the future but rescinded ab initio." *Id.* And to rescind the contract, the non-disclosure or misrepresentation must be material to the loss for which the insured seeks coverage. *See* Marine Insurance Act 1906, at § 18(1).

A breach of warranty is different. Rather than arising from a common law duty, warranties are creatures of the contract created by the parties. And instead of including every material circumstance known to the insured, warranties are limited to the particular promises made in the contract. *See Colinvaux Law of Insurance* 8-002 (11th ed. 2016) (Dckt. No. 87-4, at 3 of 66) (citation omitted) ("An insurance warranty is [a] promise by the assured that a *given* fact is true, or that a *given* fact will remain true, or that he will behave or refrain from behaving in a *particular* way.") (emphasis added). In an insurance contract, warranties are fundamental to the insurer's obligation to provide coverage under the policy: they are conditions on which coverage

depends. That is, the insurer only has to perform (*i.e.*, cover losses under the policy) if the insurer complies with the warranty. *See HIH Casualty* [2001] EWCA Civ 735, at 124 (Dckt. No. 79-10, at 34 of 57) ("[T]he insurer had only agreed to cover the risk provided the warranty was performed.").

If an insured breaches a warranty, therefore, "there is an automatic discharge" of the insurer's liability and "the insurance ceases to bind as from the time of breach." *Id.*; *see also Bank of Nova Scotia v Hellenic Mutual Risks Ass'n (Bermuda) Ltd (The Good Luck)* [1992] 1 AC 233 (HL), at 262G–263G (Dckt. No. 79-9, at 30–31 of 36). The effect is "automatic" – the insurer doesn't have to take any action to avoid liability (unlike in the case of non-disclosure or misrepresentation).

The policy continues in effect, and the insured may even have to continue paying premiums, but the insurer is no longer liable to provide coverage. *Id.* at 263C–D (Dckt. No. 79-9, at 31 of 36) ("Nor, strictly speaking, does it have the effect of bringing the contract to an end. It is possible that there may be obligations of the assured under the contract which will survive the discharge of the insurer from liability, as for example a continuing liability to pay a premium."). And the breach of warranty doesn't merely eliminate coverage for losses related to the breach. Instead, the breach of warranty eliminates all coverage under the policy, "even though any subsequent loss had nothing to do with the breach of warranty." *HIH Casualty* [2001] EWCA Civ 735, at 124 (Dckt. No. 79-10, at 34 of 57); Merkin, *A Guide To Reinsurance Law* 221 (1st ed. 2007) (Dckt. No. 87-5, at 12 of 17) ("It is a feature of English insurance law that a warranty need not be material to the risk. The most important feature of a warranty from the point of view of underwriters is that they are able to deny coverage where a false statement

has been made to them even though the statement was not material and thus would not have justified avoidance on the grounds of misrepresentation . . . .").

So, the non-rescindable clause addresses different rights and remedies. Under English and Welsh law, an insurer that waives its right to rescind a policy for non-disclosure or misrepresentation does not automatically waive its right to rely on a warranty. *See Colinvaux Law of Insurance* 8-085 (11th ed. 2016) (Dckt. No. 87-4, at 44–45 of 66) (citation omitted) ("Where insurers agreed not to avoid or rescind the policy or to reject any claim for non-disclosure or misrepresentation, they were held not to have waived their right to rely upon breach of warranty, given that such breach did not involve any avoidance or denial of liability."); Merkin, *A Guide To Reinsurance Law* 223 (1st ed. 2007) (Dckt. No. 87-5, at 14 of 17) (citation omitted) ("A waiver which purports to remove the right of insurers to avoid or repudiate the policy for misrepresentation will not, however, be effective to waive breach of warranty, as the remedy for breach of warranty is not avoidance of the policy *ab initio* or treating the policy as repudiated but rather the automatic termination of the risk as from the date of breach . . . ."). So the basis clause can peacefully coexist with the non-rescindable clause, without creating internal discord in the policy.

Third, Plaintiffs argue that treating the statements in the Proposal Form as warranties would nullify a warranties clause in the policy, which reads "**EXPRESS WARRANTIES**: None, other than as may be contained in the policy documentation." *See* First Layer Policy, at 2 (Dckt. No. 62-2, at 4 of 30) (emphasis in original). Plaintiffs acknowledge that the policy does not define "policy documentation," but they argue that "there is no indication it includes the Proposal." *See* Pls.' Opp. to Mot. for J. on the Pleadings, at 9 n.10 (Dckt. No. 85, at 10 of 18).

The provision about express warranties does not advance the ball. The provision doesn't say that there are no warranties. It simply says that there are no warranties *except* what's in the policy documentation. It excludes warranties that aren't there anyway.

The exclusion has no bearing because the policy documentation includes the Proposal Form. That much is clear from the Form itself, which states that it "will form part of any insurance[.]" *See* Proposal Form, at 1 (Dckt. No. 62-1, at 2 of 71). The policies confirm the point, by expressly listing the Proposal Form as among the "[i]nformation . . . provided to Insurers to support the assessment of the risk at the time of underwriting[.]" *See* First Layer Policy, at 24 (Dckt. No. 62-2, at 26 of 30); Second Layer Policy, at 11 (Dckt. No. 62-3, at 13 of 17); Third Layer Policy, at 11 (Dckt. No. 62-4, at 13 of 17).

In sum, based on the plain text, the "basis of any contract" language in the Proposal Form is a basis clause under English and Welsh law. As a result, the representations in the Proposal Form have the status of warranties.

### 2. Breach of Warranty

The next question is whether Sinav breached the warranty. Or more precisely, the question is whether the Second Layer insurers have an airtight defense – based strictly on the pleadings – that Sinav breached the warranty.

Basically, the insurers argue that the complaint admits that the Plaintiffs had knowledge of circumstances that may give rise to a claim. In their view, the complaint defeats itself because it shows that Plaintiffs breached a warranty.

The argument rests on Sinav's answer to the question about knowledge of any circumstances that may give rise to claim. The Proposal Form posed the following question: "Is the Proposer aware, after enquiry, of any circumstance or incident, which may give rise to a claim against any Director or Officer of the Company in such capacity?" *See* Proposal Form, at

§ 6 (Dckt. No. 62-1, at 4 of 71). Sinav answered "No." *Id.* According to the Second Layer insurers, that answer was inaccurate, and a reader needs to look no further than the complaint to see its falsity. The falsity of the answer, they claim, is beyond doubt – based on the complaint itself.

The Second Layer insurers attempt to stand on the smallest of toeholds. They rest entirely on one sentence in the complaint. Part of one sentence, actually. They latch on to a sentence alleging that "certain minority unitholders had expressed dissatisfaction with the Minority Buyout in the first quarter of 2012." *See* Second Am. Cplt. ¶ 48(e) (Dckt. No. 62).

That phrase, standing alone, cannot support the weight of the argument. For starters, the Second Layer insurers rely on only part of the sentence. The entire sentence reads as follows: "Although certain minority unitholders had expressed dissatisfaction with the Minority Buyout in the first quarter of 2012, by the end of the [sic] 2012—and certainly by January 2014—the minority unitholders gave no indication that they would pursue legal action related to the Minority Buyout." *Id.*

The key takeaway is the opposite of what the insurers argue here. The insurers rely on a phrase that begins with "[a]lthough." *Id.* The use of the word "although" tips off the reader that the main point will come later. The latter half of the sentence contains the punchline: there was "no indication" at the time of the application that litigation about the Minority Buyout was on the horizon. *Id.* Read as a whole, the sentence basically alleges that the expression of dissatisfaction was no big deal. That allegation may or may not pan out, but at this early stage, the inferences flow in favor of the non-moving party. *See Denan v. Trans Union LLC*, 959 F.3d 290, 293 (7th Cir. 2020); *Forseth v. Vill. of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000).

Even then, the Second Layer insurers put forward an overly strong reading of that isolated phrase. "[E]xpress[ing] dissatisfaction" is not synonymous with threatening litigation. Consider everyday life – not every expression of dissatisfaction gives rise to a reasonable belief that litigation might ensue. True, expressing dissatisfaction *can* mean threatening a lawsuit. But it can mean something less than that, too. It will take discovery to ferret out whether the expressions of dissatisfaction here would give rise to a reasonable belief about potential lawsuits.

There are too many factual questions to declare, as a matter of law, that an expression of dissatisfaction gives rise to knowledge of a potential claim. The fragment of the sentence is too amorphous, leaving too many questions up in the air. It does not reveal who expressed dissatisfaction, or what they said, or how they said it, or how many times. Did they express dissatisfaction with the price? The timing? The loss of an ownership stake in general? Something else? Tone matters, and so does the content. But at this stage, it is unclear what, exactly, Sinav knew, let alone whether a reasonable person would have anticipated possible litigation.

And then there is the rest of the complaint. Other allegations cemented the point that Plaintiffs had no reason to foresee litigation. Consider the allegations about the process. The board approved the Minority Buyout after consulting with outside counsel. *See* Second Am. Cplt. ¶ 29. The board also approved the buyout at the price calculated by an independent valuation firm. *Id.* And when the time came, each of the minority unitholders tendered their stake in the company and accepted payment. *Id.* at ¶ 48(c). The complaint paints a picture of a process that raised no red flags. Maybe they're applying a coat of gloss that will prove to be too thick, but at this early stage, Plaintiffs are entitled to the benefit of the doubt. *See Forseth*, 199

F.3d at 368 ("We accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.").

The complaint contains other allegations that explain why Sinav did not foresee litigation. Plaintiffs rely heavily on the passage of time. Sinav applied for insurance on January 8, 2014, almost two years after the board approved the Minority Buyout in January 2012. *See* Second Am. Cplt. ¶¶ 48(d), 48(e). In the meantime, no one sued. No one even *threatened* to sue. By January 2014, the minority unitholders "gave no indication that they would pursue legal action related to the Minority Buyout." *Id.* at ¶ 48(e).

In fact, "multiple minority unitholders" told two of the Plaintiffs that they had "no intent to bring any legal action relating to the Minority Buyout." *Id.* at ¶ 48(f). The complaint offers specific examples, such as a conversation with the largest minority unitholder. *Id.* Several minority unitholders met with legal counsel about the Minority Buyout, and later told one of the Plaintiffs that they had agreed not to sue. *Id.*

The complaint also alleges that the minority unitholders didn't even have the ammunition to sue when Sinav applied for insurance. In February 2014, one month after the Proposal Form, the minority unitholders received a draft valuation report for the first time. That draft report was "the reason" why they filed suit. *Id.* at ¶ 48(i). Presumably the report revealed that the company was worth a lot more than what the unitholders received. But the minority unitholders didn't even have a copy of the report when Sinav applied for insurance in January 2014. *Id.* The minority unitholders testified that they had "no intent to file the Underlying Action until February 2014 at the earliest," one month *after* Sinav submitted the application. *Id.* at ¶ 48(h).

The complaint further downplays the likelihood of litigation by, in effect, relitigating the merits of the claims made by the minority unitholders in the Underlying Action. For example,

36

the four Plaintiffs "fully complied with the standards of conduct set forth in the LLC Agreement and all applicable laws." *Id.* at ¶ 48(j). The LLC Agreement "authorized and allowed" the board to do a minority buyout, and barred any claims challenging the value of the buyout. *Id.* at ¶ 29. So, the complaint alleges that litigation was unlikely because there wasn't a lot of room for litigation.

Against that backdrop, a mere expression of dissatisfaction is too slender of a reed to support judgment in the insurers' favor at this early stage. The Court must read the complaint "as a whole," and do so in the light most favorable to the non-moving party. *See Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011); *see also Olson v. Champaign County, Illinois*, 784 F.3d 1093, 1100–01 (7th Cir. 2015) (reading plaintiff's complaint "as a whole" on Rule 12(b)(6) motion) (citations omitted); *Boim v. Quranic Literacy Inst. & Holy Land Found. For Relief And Dev.*, 291 F.3d 1000, 1008 (7th Cir. 2002) (same); *Denan v. Trans Union LLC*, 959 F.3d 290, 293 (7th Cir. 2020) (viewing all facts in the light most favorable to the non-movant); 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1368 (3d ed. 2020). When read in its entirety, the complaint offers specific facts supporting the notion that there was no reason to believe that litigation may ensue. At this stage, that is enough.

The likelihood of litigation is a fact-laden question that is ill-suited to resolution on a motion for judgment on the pleadings, absent a clean admission. The Proposal Form asked about circumstances that "may give rise to a claim." *See* Proposal Form, at § 6 (Dckt. No. 62-1, at 4 of 71). It asked about probabilities. As Lord Justice Toulson explained in an English case about a similar insurance warranty, the "question whether a circumstance may give rise to a claim is not a matter of simple knowledge, a question of fact of which a person may or may not be 'aware';

rather, it involves a degree of crystal ball gazing, an estimation of the likelihood of a claim." *See HLB Kidsons v. Lloyd's Underwriters* [2008] EWCA Civ 1206, at ¶ 137 (Dckt. No. 79-8).[6]

In essence, the Second Layer insurers take a hardline view that *any* expression of dissatisfaction, by definition, is a circumstance that may give rise to a claim. The complaint merely alleges that some minority unitholders expressed dissatisfaction with the deal. *See* Second Am. Cplt. ¶ 48(e) (Dckt. No. 62). That meager allegation cannot lead to judgment in the insurers' favor unless an expression of displeasure automatically qualifies as a circumstance that may lead to a claim. But the Second Layer insurers offer no support for the notion that an expression of dissatisfaction, without more, necessarily gives rise to knowledge of a potential claim.

---

[6] Plaintiffs and the insurers dispute which law the Court should apply to the question whether Sinav breached the warranty in the insurance application, releasing the insurers from any coverage obligations. The insurers argue that the Court must follow the parties' contractual choice of English and Welsh law, which only requires insurers to prove that Sinav breached the warranty, not that the breach was intentional or material. *See Dawsons* [1922] 2 A.C. 413, at 413 (Dckt. No. 79-5); *see also Genesis*, [2013] EWCA Civ 1173, at ¶ 57 (Dckt. No. 79-6). Plaintiffs want to override the contract's choice-of-law provision and apply Illinois law, which would require the insurers to prove that the breach of warranty was either intentional or material. *See* 215 ILCS 5/154. To grant Plaintiffs' wish, the Court would have to hold that applying "the express choice of law [English and Welsh] would *both* violate fundamental Illinois public policy *and* Illinois has a materially greater interest in the litigation than the chosen State [England and Wales]." *Smurfit Newsprint Corp. v. Se. Paper Mfg.*, 368 F.3d 944, 949 (7th Cir. 2004) (cleaned up; emphasis in original). No court has addressed whether the Illinois statute preferred by Plaintiffs represents the fundamental policy of Illinois, although many courts have addressed the public policy exception as applied to different statutes and common law rules. *See Hendricks v. Novae Corp. Underwriting, Ltd*, 868 F.3d 542, 545–46 (7th Cir. 2017); *Carris v. Marriott Int'l, Inc.*, 466 F.3d 558, 562 (7th Cir. 2006); *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 389–91 (7th Cir. 2003); *Spinozzi v. ITT Sheraton Corp.*, 174 F.3d 842, 846–48 (7th Cir. 1999); *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 20 F.3d 713, 719 (7th Cir. 1994), *rev'd on other grounds*, 514 U.S. 52, 115 (1995); *Lewis Bros. Bakeries v. Bittle*, 2007 WL 4441225, at *7–8 (S.D. Ill. 2007); *Pancotto v. Sociedade de Safaris de Mocambique, S.A.R.L.*, 422 F. Supp. 405, 409–12 (N.D. Ill. 1976); *Lyons v. Turner Const. Co.*, 195 Ill. App. 3d 36, 39–42, 141 Ill. Dec. 719, 551 N.E.2d 1062 (1990); *Donaldson v. Fluor Eng'rs, Inc.*, 169 Ill. App. 3d 759, 762–64, 120 Ill. Dec. 202, 523 N.E.2d 1113 (1988). The Court need not decide the choice-of-law question at this stage. Both bodies of law require proving a breach of warranty, even if Illinois requires an additional showing. And, as discussed above, the Second Layer insurers have failed to point to an admission in the pleadings that Sinav breached a warranty. So the Court cannot grant judgment on the pleadings under either law.

Maybe the complaint isn't telling the full story. Maybe the minority unitholders objected more vigorously than the complaint suggests. And maybe the facts will show that Sinav had more than ample reason to think that litigation was a distinct possibility. Time will tell. But at this point in time, the complaint defines the factual terrain, and it does not contain an admission that Sinav was aware of potential litigation.

Apart from a single phrase in a single sentence in the complaint, the Second Layer insurers rely on materials *outside* the pleadings to support their motion for judgment *on* the pleadings. In particular, the insurers rely heavily on an opinion by the state court in the Underlying Action. *See* Second Layer Mot. for J. on the Pleadings, at 7–8 (Dckt. No. 79, at 8–9 of 18). The state court opinion, in turn, summarized letters submitted by some of the minority unitholders in 2012. *See* Underlying Action S. J. Order, at 46–47 (Dckt. No. 79-1). According to the state court, "after the freezeout the minority unitholders expressed their displeasure with the buyout process and price." *Id.* at 46.

The insurers lose sight of the type of motion that they filed. They filed a motion for judgment on the pleadings, which means that the motion rises or falls based on the content of the pleadings – meaning the pleadings *alone*. But instead of relying on the pleadings, the insurers rely on material outside the pleadings: the state court opinions, and underlying evidence in that litigation. This Court cannot consider material outside the pleadings without converting the motion to a motion for summary judgment, *see* Fed. R. Civ. P. 12(d), which this Court declines to do.

The insurers invoke the collateral attack doctrine under Illinois law, which prevents a collateral attack on a "final judgment" rendered by an Illinois court. *See* Second Layer Reply in Supp. of J. on the Pleadings, at 10–11 (Dckt. No. 87, at 11–12 of 18); *see also Malone v.*

*Cosentino*, 99 Ill. 2d 29, 32–33, 75 Ill. Dec. 401, 457 N.E.2d 395 (1983); *Apollo Real Estate Inv. Fund, IV, L.P. v. Gelber*, 403 Ill. App. 3d 179, 189, 343 Ill. Dec. 735, 935 N.E.2d 963 (2010) (same). Interlocutory orders are immune from collateral attack, too. *See Lewis v. Blumenthal*, 395 Ill. 588, 593, 71 N.E.2d 36 (1947); *Thomas v. Skodowski*, 303 Ill. App. 3d 1028, 1035, 237 Ill. Dec. 401, 709 N.E.2d 656 (1999).

The collateral attack doctrine does not apply here. Plaintiffs are not using this litigation to undermine the judgment of the state court. They aren't asking this Court to undo what the state court did. A judgment that the insurers owe coverage (in this case) would not undermine the judgment that Plaintiffs are liable (in the state court case). The insurers think that Plaintiffs are bound by the findings of the state court. Maybe so, but that does not mean that the collateral attack doctrine is the right doctrine.

Plaintiffs seem to be arguing collateral estoppel, without saying so out loud. But again, it is important to remember that the insurers filed a motion for judgment on the pleadings, not a motion for summary judgment. Collateral estoppel is an affirmative defense. *See Best v. City of Portland*, 554 F.3d 698, 700 (7th Cir. 2009); *Adair v. Sherman*, 230 F.3d 890, 894 (7th Cir. 2000). A motion for judgment on the pleadings is not an avenue for adjudicating affirmative defenses unless the pleadings themselves establish the defense. *See, e.g., Richards v. Mitcheff*, 696 F.3d 635, 637–38 (7th Cir. 2012) ("[A] complaint that alleges an impenetrable defense to what would otherwise be a good claim should be dismissed (on proper motion) under Rule 12(c)."); *Edgenet, Inc. v. Home Depot U.S.A., Inc.*, 658 F.3d 662, 665 (7th Cir. 2011) ("When the complaint itself contains everything needed to show that the defendant must prevail on an affirmative defense, then the court can resolve the suit on the pleadings under Rule 12(c)."). And here, the Second Layer insurers leave the pleadings behind, and ask this Court to consider

what some other court reviewed and found. The Second Layer insurers treat a motion for judgment *on* the pleadings like a motion for judgment *outside* the pleadings.

Even then, at this early stage, the record is not clean enough for a finding of issue preclusion. The insurers do not define the issue decided by the state court with any level of specificity or precision. Collateral estoppel (if the insurers had invoked it) would require this Court to find that an issue over there is the same as an issue over here – that is, that the state court already decided an issue that Plaintiffs also ask this Court to decide. Defining the issue is a critical step, but the insurers offer a level of generality that is much too high.[7]

The outcome might have been different if Plaintiffs had advanced a claim that the state court already adjudicated in a final judgment. In that case, the doctrine of res judicata might apply, and this Court could take judicial notice of a state-court judgment. *See* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1371 (3d ed. 2020) ("Conversion [to a motion for summary judgment] also will not occur with regard to all matters subject to judicial notice . . . ."); *see also Daniel v. Cook County*, 833 F.3d 728, 742 (7th Cir. 2016) ("Courts routinely take judicial notice of the actions of other courts or the contents of filings in other courts."). But the issue at hand is not so clean. The state court action involved different claims than the ones before this Court. The insurers rely not on a judgment, but on bits and

---

[7] The Second Layer insurers also concede that the state court's partial summary judgment order is not a final judgment, which would be required under Illinois law to apply collateral estoppel in this litigation. *See* Second Layer Reply in Supp. of J. on the Pleadings, at 10–11 (Dckt. No. 87, at 11–12 of 18); *see also* Underlying Action Order dated 2/1/19 (Dckt. No. 85-6) (stating that the state court's partial summary judgment order and order ruling on the motion for reconsideration "are not final and appealable orders . . . ."); *EOR Energy LLC v. Illinois Envt'l. Prot. Agency*, 913 F.3d 660, 664 (7th Cir. 2019) (holding that federal courts must give the same preclusive effect to a state-court judgment that it would receive under state law) (citation omitted); *People v. Hopkins*, 235 Ill. 2d 453, 469, 337 Ill. Dec. 465, 922 N.E.2d 1042 (2009) ("[F]or purposes of applying the doctrine of collateral estoppel, finality requires that the potential for appellate review must have been exhausted.") (cleaned up). So a collateral estoppel argument – had the Second Layer insurers made one – would not get off the ground at this early stage.

pieces from the state court record, including underlying evidence. Grasping for evidence from a

state court record – on a motion for judgment on the *pleadings* – is too much of a reach.

In sum, the complaint is not self-defeating. The complaint, standing alone, does not

demonstrate that Sinav breached a warranty in its insurance application. Maybe the Second

Layer insurers will prevail on this point someday, depending on how the facts unfold. But at this

point, based on the complaint alone, the defense is less than airtight.

### C.     Deliberate Acts or Willful Misconduct

The Second Layer insurers also argue that Plaintiffs are not entitled to coverage under the

policies because they seek coverage for losses caused by their own intentional fraud or

dishonesty. *See* Second Layer Mot. for J. on the Pleadings, at 11–14 (Dckt. No. 79, at 12–15 of

18).

The insurers rely on language in the policy that precludes coverage for claims arising out

of or based upon intentional dishonesty or fraud:

> The insurer shall not be liable to make any payment under any
> extension or in connection with any claim . . . arising out of, based
> upon or attributable to:  (i) a wrongful act intended to secure or
> which does secure the gaining of profit or advantage to which the
> insured was not legally entitled; or (ii) the intentional committing of
> (a) dishonesty or fraud; or (b) a criminal breach of law or regulation;
> in the event that any of the above is established by final adjudication
> of a judicial or arbitral tribunal, admission by the insured or written
> finding of a regulator.

*See* First Layer Policy, at § 4.1 (Dckt. No. 62-2, at 15 of 30).  More generally, they cite English

and Welsh insurance law for the notion that the "insurer is not liable for any loss attributable to

the willful misconduct of the assured."  *See* Second Layer Mot. for J. on the Pleadings, at 9

(Dckt. No. 79, at 10 of 18) (quoting Marine Insurance Act 1906, § 55(2)(a)).

That argument is the same song, different verse.  Once again, the insurers support their

argument solely by referring to the state court's partial summary judgment order in the

Underlying Action. *See* Second Layer Mot. for J. on the Pleadings, at 11–14 (Dckt. No. 79, at 12–15 of 18); Second Layer Reply in Supp. of J. on the Pleadings, at 10–15 (Dckt. No. 87, at 11–16 of 18). A motion for judgment on the pleadings is tethered to the complaint. Nothing in the complaint shows that Plaintiffs committed "intentional . . . dishonesty or fraud." *See* First Layer Policy, at § 4.1 (Dckt. No. 62-2, at 15 of 30). So this Court must deny the motion for judgment on the pleadings.

The procedural problem is enough to deny the motion. But even if this Court could leave the pleadings behind, and embark to the state court record, it is not at all clear that the state court case involved claims for intentional dishonesty or fraud.

The state court case involved claims for breach of contract and breach of fiduciary duty. A breach of contract and a breach of fiduciary duty can involve dishonesty or fraud. But it is possible to breach a contract and breach fiduciary duties without dishonesty or fraud, too. The circles may overlap, but they are not concentric, either. So, even if Plaintiffs breached the LLC Agreement and their fiduciary duties, that does not necessarily mean that they acted with intentional dishonesty or fraud.

The insurers argue that the exclusion applies because the "state court found that Plaintiff Lemajeur lied leading up to the Minority Buyout." *See* Second Layer Mot. for J. on the Pleadings, at 11 (Dckt. No. 79, at 12 of 18). But the opinion from the state court does not live up to its billing. The state court merely noted – in one paragraph of a 61-page opinion – that an email by Plaintiff Lemajeur was inconsistent with his affidavit. *See* Underlying Action S. J. Order, at 21 (Dckt. No. 79-1). True, the state court used a catchy phrase: "The 'I was untruthful then but am truthful now' defense is rarely persuasive." *Id.* But not every inconsistency is a lie.

And even if the state court exposed a lie, that does not necessarily mean that the state court case involved any "claim" for intentional dishonesty or fraud.

Under the insurers' reading, any untruthful statement made in the course of a lawsuit is enough to bring it within the scope of the exclusion. But that's not what the policy says. The policy excludes "claim[s]" arising out of intentional dishonesty or fraud. *See* First Layer Policy, at § 4.1 (Dckt. No. 62-2, at 15 of 30). The insured does not lose coverage simply by making an inaccurate statement when the "claims" themselves involve something else. Under the policy, the nature of the claim against the insured is what matters.

The insurers also argue that the state court case involved "serious conflicts of interest in the Minority Buyout." *See* Second Layer Mot. for J. on the Pleadings, at 11 (Dckt. No. 79, at 12 of 18). Maybe so. But the existence of conflicts of interest does not necessarily mean that the insured faced "claims" for intentional dishonesty or fraud.

The insurers try again, arguing that the "state court held that Plaintiffs intentionally refused to deal fairly" with the minority unitholders. *Id.* That would be a good argument if the policy barred claims for a refusal to deal fairly with others. But it doesn't. It bars "claims" arising out of intentional dishonesty or fraud. An "intentional" act is necessary, but not sufficient. The policy excludes the "intentional committing of (a) dishonesty or fraud." *See* First Layer Policy, at § 4.1 (Dckt. No. 62-2, at 15 of 30). Not every intentional act counts.

A state court finding that the Plaintiffs acted "willfully" is not enough, either. *See* Second Layer Reply in Supp. of J. on the Pleadings, at 12–13 (Dckt. No. 87, at 13–14 of 18). A willful act is not necessarily an intentionally dishonest act. Consider, for example, the willful act of getting one's morning cup of coffee. The insurers point to the failure to disclose, but not every failure to disclose is dishonesty, either. *Id.*

44

The insurers make a few other arguments in the same vein, and the result is the same, too. The insurers rest on parts of the state court record, but it is not enough to support a motion for judgment on the pleadings.

At this stage, the Court is not foreclosing the insurers from arguing that the state court case did, in fact, involving "claims" arising out of intentional dishonesty or fraud. The motion does not fit with the Federal Rules, so the Court denies the motion for judgment on the pleadings on that ground. Down the road, the insurers will have the opportunity to present evidence about the policy exclusion. But as things stand, it is not clear that the insurers have the better of the argument, even if the Court could leave the pleadings behind.

## Conclusion

The Third Layer insurers' motion to dismiss Counts II and III is granted. Count IV is dismissed with prejudice as to all Defendants. The Second Layer insurers' motion for judgment on the pleadings is denied.

Date:  July 2, 2020

Steven C. Seeger
United States District Judge